FILED
2013 Dec-11  PM 01:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **SONNEY SUMMERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-12-S-1816-NE** |
| | ) | |
| **C. MARTIN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Sonney Summers, asserts claims against a former Madison County Deputy Sheriff, Chris Martin, for an alleged illegal arrest and the use of excessive force when effecting the arrest.[1] All of plaintiff's claims are asserted under 42 U.S.C. § 1983, and arise out of his arrest at the scene of a traffic stop involving his son.[2] The action is before the court on the parties' cross-motions for summary judgment,[3] and on plaintiff's motion to strike part of defendant's evidentiary submissions.[4] Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that all motions are due to be denied.

## I. STANDARD OF REVIEW

---

[1] *See* doc. no. 1 (Complaint).

[2] *See id.* at 1-2.

[3] Doc. no. 29 (Plaintiff's Motion for Partial Summary Judgment); doc. no. 31 (Defendant's Motion for Summary Judgment).

[4] Doc. no. 43 (Plaintiff's Motion to Strike).

The Federal Rules of Civil Procedure state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (alteration supplied). Thus, "the plain language of [that rule] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (alteration supplied).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> [However,] [t]he mere existence of *some* factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable [factfinder] to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (internal citations omitted, alterations and emphasis supplied).

When presented cross motions for summary judgment, "[t]he court must rule on each party's motion on an individual and separate basis, determining, for each

side, whether a judgment may be entered in accordance with the Rule 56 standard."

10A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 3d* § 2720, at

335-36 (1998) (footnote omitted, alteration supplied).  As another court within this

Circuit has observed:

> "Cross motions for summary judgment do not change the
> standard."  *Latin Am. Music Co. v. Archdiocese of San Juan of the
> Roman Catholic & Apostolic Church*, 499 F.3d 32, 38 (1st Cir. 2007).
> "Cross motions for summary judgment are to be treated separately; the
> denial of one does not require the grant of another."  *Christian Heritage
> Acad. v. Okla. Secondary Sch. Activities Ass'n*, 483 F.3d 1025, 1030
> (10th Cir. 2007) (quoting *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431,
> 433 (10th Cir. 1979)).  "Even where parties file cross motions pursuant
> to Rule 56, summary judgment is inappropriate if disputes remain as to
> material facts."  *Id.*; *accord Monumental Paving & Excavating, Inc. v.
> Pa. Mfrs.' Ass'n Ins. Co.,* 176 F.3d 794, 797 (4th  Cir. 1999) ("When
> considering motions from both parties for summary judgment, the court
> applies the same standard of review and so may not resolve genuine
> issues of material fact.  Instead, [the court must] consider and rule upon
> each party's motion separately and determine whether summary
> judgment is appropriate as to each under the Rule 56 standard.")
> (citations omitted).

*Ernie Haire Ford, Inc. v. Universal Underwriters Insurance Co.,* 541 F. Supp. 2d

1295, 1297-98 (M.D. Fla. 2008) (alteration in original).  *See also American  Bankers

Insurance Group v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005) ("This court

reviews the district court's disposition of cross-motions for summary judgment *de

novo*, applying the same legal standards used by the district court, viewing the

evidence and all factual inferences therefrom in the light most favorable to the non-

movant, and resolving all reasonable doubts about the facts in favor of the non-moving party.").

## II.  MOTION TO STRIKE

Plaintiff asks this court to strike portions of three affidavits submitted by defendant in support of his motion for summary judgment.[5]  The affidavits contain identical language, to the effect that plaintiff "shouted angrily" at defendant as he approached the scene of the traffic stop.[6]  Plaintiff asserts that these statements should be stricken because they directly contradict testimony given in the witnesses' prior depositions.[7]  In response, defendant contends that the affidavits do not "flatly contradict," nor are they "inherently inconsistent" with, the witnesses' deposition testimony and, as such, they are not due to be stricken.[8]

The Eleventh Circuit has held that "a party cannot give 'clear answers to unambiguous questions' in a deposition and thereafter raise an issue of material fact in a contradictory affidavit that fails to explain the contradiction."  *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987) (quoting *Van T. Junkins and Associates, Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir. 1984)).  The

---

[5] *Id*. at 1.
[6] *See* doc. no. 33-1 (Affidavit of Chris Martin) ¶ 7; doc. no. 33-2 (Affidavit of James Rives) ¶ 9; doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶ 7.
[7] Doc. no. 43 (Plaintiff's Motion to Strike), at 1.
[8] Doc. no. 47 (Response to Motion to Strike), at 1-2, 5.

Eleventh Circuit has cautioned, however, that this so-called "sham affidavit" rule

should be applied "'sparingly because of the harsh effect it may have on a party's

case.'" *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1316

(11th Cir. 2007) (quoting *Rollins*, 833 F.2d at 1530).  Indeed, courts are advised to

> be careful to distinguish "between discrepancies which create
> transparent shams and discrepancies which create an issue of credibility
> or go to the weight of the evidence." *Tippens v. Celotex Corp.*, 805 F.2d
> 949, 953 (11th Cir. 1986).
>
>> [E]very discrepancy contained in an affidavit does not
>> justify a district court's refusal to give credence to such
>> evidence.  In light of the jury's role in resolving questions
>> of credibility, a district court should not reject the content
>> of an affidavit even if it is at odds with statements made in
>> an early deposition.
>
> *Id.* at 954 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894
> (5th Cir. 1980)) (alteration in original) (citation omitted).

*Faulk v. Volunteers of America*, 444 F. App'x 316, 318 (11th Cir. 2011).

As grounds for the motion to strike, plaintiff claims that statements to the effect

that he "shouted angrily" are in direct contradiction with specific portions of the

witnesses' prior deposition testimony.  Plaintiff is correct in his assertion that

defendant was questioned extensively during his deposition about what plaintiff

allegedly did and said that was perceived by the defendant as threatening behavior,

and that ultimately led defendant to arrest plaintiff, but "shouting angrily" was never

5

mentioned.[9]  Even so, plaintiff's reliance on specific passages from the depositions of Deputy Hughes and Deputy Rives for the contention that plaintiff "never yelled" at defendant is misplaced.[10]  For example, plaintiff relies on Deputy Hughes' testimony that plaintiff "never yelled anything to interfere with the traffic stop."[11] Hughes' response, however, *only* indicates that plaintiff never yelled words that *interfered with the traffic stop*, and not necessarily that plaintiff never "yelled angrily" at defendant.  Plaintiff also quotes the following exchange from Deputy Rives' deposition:

> Q.    Well, do you recall anything that Mr. Summers said?
>
> A.    That's my son, . . . or I'm here to get the truck.  I can't recall exactly how it was stated, the first comment that came out of his mouth.
>
> Q.    Something like that?
>
> A.    Something in regards to that's my son, I'm here to get the truck.
>
> Q.    Okay.  And what did Deputy Martin say?
>
> A.    Deputy Martin said for him to go back to his truck.
>
> Q.    Okay, how did he say that?

---

[9] Doc. no. 43 (Plaintiff's Motion to Strike), at 1 (citing doc. no. 30-1 (Deposition of Chris Martin), at 103-10, 134-37).

[10] *See id.* at 2.

[11] Doc. no. 30-4 (Deposition of Jeremy Hughes), at 67.

      A.     Just in a normal type voice at that time. . . .[12]

As defendant notes, however, the passage from Rives' deposition refers to the manner in which *defendant* spoke to plaintiff — that is, "in a normal voice" — and not the manner in which *plaintiff* spoke to defendant.[13]  Thus, the passage is not relevant when considering whether the three affidavit statements should be stricken.

In response to the motion to strike, defendant points to several passages from the witnesses' prior deposition testimony in which plaintiff was described as "erratic,"[14] "hostile,"[15] "aggressive,"[16] "irate,"[17] "agitated,"[18] "aggravated,"[19] and "angry."[20]  Further, defendant points out that Deputy Hughes testified that plaintiff questioned defendant Chris Martin "in a very hostile, aggressive voice."[21]

This court concludes that there is no "inherent inconsistency" between the affidavits and the deposition testimony.  Accordingly, any conflicts or discrepancies present an issue of credibility that should be considered by the trier of fact.  Thus, the motion to strike will be denied.

---

[12] Doc. no. 30-5 (Deposition of James Rives), at 41-42.

[13] Doc. no. 47 (Response to Motion to Strike), at 3-4.

[14] Doc. no. 30-4 (Deposition of Jeremy Hughes), at 19.

[15] *Id*. at 35.

[16] *Id*. at 35, 64.

[17] Doc. no. 30-5 (Deposition of James Rives), at 46, 50.

[18] Doc. no. 30-1 (Deposition of Chris Martin), at 76.

[19] *Id*. at 104, 157.

[20] *Id*. at 104-06, 157.

[21] Doc. no. 30-4 (Deposition of Jeremy Hughes), at 35.

7

## III.  SUMMARY OF FACTS

Defendant, Chris Martin, and two fellow Deputy Sheriffs, James Rives and Jeremy Hughes, worked second shift for the Madison County Sheriff's Department on May 14, 2010.[22]  They were assigned to patrol a northern portion of the County.[23]  During a regular patrol, Deputy Rives initiated a traffic stop for a seat belt violation at approximately 4:00 p.m. near the intersection of Charity Lane with Butter & Egg Road in Hazel Green, Alabama.[24]  The driver of the vehicle was plaintiff's son, Sonney Summers, Jr. ("Junior").[25]  The passenger in Junior's vehicle had an outstanding felony arrest warrant.[26]  Consequently, Deputy Rives called the Sheriff's Dispatch Operator and requested backup assistance.[27]  Defendant and Deputy Hughes responded to the call.[28]

Deputy Hughes arrived first, and assisted Deputy Rives in removing Junior and his passenger from their vehicle.[29]

---

[22] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 1; doc. no. 33-2 (Affidavit of James Rives) ¶ 1; doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶ 1.

[23] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 1; doc. no. 33-2 (Affidavit of James Rives) ¶ 1; doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶ 1.

[24] Doc. no. 33-2 (Affidavit of James Rives) ¶ 2.

[25] *Id*.

[26] *Id.* ¶ 4.

[27] *Id*.

[28] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 2; doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶ 2.

[29] Doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶¶ 3, 5.

Defendant arrived on the scene as Deputy Hughes and Deputy Rives were escorting the two individuals out of their vehicle.[30]  As defendant exited his patrol car and began to approach the area of the traffic stop, a white truck, traveling south on Butter & Egg Road, and containing two occupants, stopped at the scene.[31]  At the time of the truck's arrival, none of the deputies knew the identities of the persons occupying the white truck, or the reason for their presence.[32]

After stopping, plaintiff exited the truck from the passenger side door, walked around the front-end of the vehicle, and in the direction of defendant.[33]  As plaintiff approached, Junior informed Deputy Hughes that the person was his father, and that he was there to retrieve Junior's vehicle.[34]

Defendant claims that plaintiff appeared aggravated and shouted angrily at him.[35]  As noted in the discussion of plaintiff's motion to strike, however, plaintiff denies that allegation.[36]

---

[30] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 3; doc. no. 33-2 (Affidavit of James Rives) ¶ 6; doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶ 4.

[31] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 5.

[32] *Id*. ¶¶ 5-6; doc. no. 33-2 (Affidavit of James Rives) ¶¶ 6-7; doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶¶ 5-6.

[33] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 7; doc. no. 30-1 (Deposition of Chris Martin), at 63-64; doc. no. 30-4 (Deposition of Jeremy Hughes), at 68.

[34] Doc. no. 33-3 (Affidavit of Jeremy Hughes) ¶ 7.

[35] Doc. no. 30-1 (Deposition of Chris Martin), at 107.

[36] Doc. no. 41 (Plaintiff's Response in Opposition of Defendant's Motion for Summary Judgment), at 2-3 (citing doc. no. 42-3 (Criminal Complaint); doc. no. 30-7 (Deposition of Sonney Summers), at 77-79).

As plaintiff drew near, defendant "fairly quickly" ordered him to return to his truck and to leave the scene.[37]  Plaintiff claims that he attempted to state his identity and explain why he had driven to the scene, both before and after defendant's initial order to leave.[38]  Defendant contends, however, that plaintiff ignored his first order, and continued to shout and walk towards defendant.[39]  Plaintiff admits that he continued to walk towards defendant, but denies shouting.[40]

Defendant then issued a second order for plaintiff to return to his truck and leave the scene.[41]  Following defendant's second command, plaintiff turned and began to walk in the direction of his truck, but he uttered the words "Go to hell" as he did so.[42]  Defendant contends that he then became concerned for his own safety, as well as the safety of his fellow deputies, based upon plaintiff's alleged "unusual comments" and "unsettling demeanor."[43]  For that reason, he began to follow plaintiff, and issued two or three additional verbal commands to "stop" and/or "come

---

[37] Doc. no. 30-1 (Deposition of Chris Martin), at 107; doc. no. 33-1 (Affidavit of Chris Martin) ¶ 8.

[38] Doc. no. 30-7 (Deposition of Sonney Summers), at 89-90.

[39] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 8.

[40] Doc. no. 41 (Response to Defendant's Motion for Summary Judgment), at 2-3.

[41] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 8.

[42] Doc. no. 30-1 (Deposition of Chris Martin), at 126-27 (stating that plaintiff "told [him] to go to hell, turned around, and threw his hand up"); doc. no. 30-6 (Deposition of Christine Summers), at 36-38; doc. no. 30-7 (Deposition of Sonney Summers), at 77-79.

[43] Doc. no. 30-1 (Deposition of Chris Martin), at 127; doc. no. 33-1 (Affidavit of Chris Martin) ¶ 10.

here," all of which were ignored.[44]   Plaintiff denies that he made any unusual comments, or exhibited an "unsettling demeanor," and contends that he would have heard the alleged commands to "stop" and/or "come here," *if* they actually had been given.[45]

It is not surprising, therefore, that the parties present disputed versions of the facts leading up to plaintiff's arrest.  Plaintiff, for example, contends that defendant caught him from behind, beat his head against the frame of the truck, threw him to the ground, and slammed a knee into the upper middle part of his back.[46]

Defendant's version of the altercation is different.  Due to plaintiff's alleged unusual comments and demeanor, defendant deemed it necessary to temporarily detain plaintiff — both for the purpose of ensuring that he was not armed, and to prevent him from obtaining a potential weapon from his vehicle.[47]   Defendant contends that he first made physical contact with plaintiff outside the open door of

---

[44] Doc. no. 30-1 (Deposition of Chris Martin), at 127; doc. no. 33-1 (Affidavit of Chris Martin) ¶ 10.

[45] *See* doc. no. 41 (Response to Defendant's Motion for Summary Judgment), at 3-4 (citing doc. no. 30-6 (Deposition of Christine Summers), at 38; doc. no. 30-7 (Deposition of Sonney Summers), at 91).

[46] Doc. no. 30-6 (Deposition of Christine Summers), at 39-42.  *See also* doc. no. 30-7 (Deposition of Sonney Summers), at 93-95 (stating that the only thing he remembers was feeling the pressure of the car door slamming into him); doc. no. 30-4 (Deposition of Jeremy Hughes), at 12-14 (stating that he saw the car door shake during the alleged altercation).

[47] Doc. no. 33-1 (Affidavit of Chris Martin) ¶¶ 10-12; doc. no. 30-1 (Deposition of Chris Martin), at 89-93, 121.

plaintiff's truck by grabbing his arm.[48]  Plaintiff then allegedly attempted to pull his arm away and refused to cooperate.[49]  In an effort to gain control of plaintiff, defendant placed him in a "straight arm bar" and took him to the ground.[50]  Even though plaintiff allegedly continued to resist, defendant was eventually able to secure him with handcuffs.[51]

The remaining facts are not in dispute.  Shortly after he was handcuffed, plaintiff complained that his arm was injured and that he was having chest pains.[52] For that reason, defendant removed the handcuffs, and requested ambulance assistance.[53]  Defendant is a certified Emergency Medical Technician, and is trained to provide emergency medical assistance to individuals in distress.[54]  Thus, upon hearing plaintiff's complaints of chest pain, defendant retrieved an automated external defibrillator (an "AED") from his patrol car and applied it to plaintiff.[55] Because the device did not detect an abnormal heart rhythm, no shock was administered.[56]  Upon arrival of the ambulance, plaintiff was taken to Huntsville

---

[48] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 13.

[49] *Id.* ¶ 14.

[50] *Id.*

[51] *Id.* ¶¶ 15-16.

[52] *Id.* ¶ 17.

[53] *Id.*

[54] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 18.

[55] *Id.* ¶¶ 18-19; doc. no. 30-1 (Deposition of Chris Martin), at 41-45.

[56] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 19.

Hospital where he underwent a series of tests.[57]  The tests revealed that plaintiff's

blood sugar and blood pressure levels were elevated, but the x-ray results of his arm

were normal.[58]  Plaintiff was ultimately discharged from the hospital and transported

to the Madison County Jail.[59]  He was released on his own recognizance at

approximately 10:47 p.m. on the same date, May 14, 2013.[60]  Plaintiff testified in his

deposition that he did not suffer any serious injuries, and that his pain ceased within

approximately one week of the incident.[61]

Plaintiff was charged with disorderly conduct in violation of Alabama Code §

13A-11-7 (1975),[62] and resisting arrest in violation of Alabama Code § 13A-10-41.[63]

At his trial in the District Court for Madison County, Alabama, plaintiff was found

---

[57] *Id*. ¶ 20; doc. no. 30-7 (Deposition of Sonney Summers), at 30-33.

[58] Doc. no. 30-7 (Deposition of Sonney Summers), at 99-100.

[59] Doc. no. 33-1 (Affidavit of Chris Martin) ¶ 21.

[60] *Id.*

[61] Doc. no. 30-7 (Deposition of Sonney Summers), at 99-100, 102.

[62] *See* doc. no. 1 (Complaint) ¶ 10. Section 13A-11-7 provides that "(a) A person commits the crime of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:  (1) [e]ngages in fighting or in violent tumultuous or threatening behavior; or (2) [m]akes unreasonable noise; or (3) [i]n a public place uses abusive or obscene language or makes an obscene gesture; or (4) [w]ithout lawful authority, disturbs any lawful assembly or meeting of persons; or (5) [o]bstructs vehicular or pedestrian traffic, or a transportation facility; or (6) [c]ongregates with other person in a public place and refuses to comply with a lawful order of the police to disperse.  (b) Disorderly conduct is a Class C misdemeanor."  Ala. Code § 13A-11-7 (1975) (Replacement Vol. 2005) (alterations supplied).

[63] *See* doc. no. 1 (Complaint) ¶ 10. Section 13A-10-41 states: "(a) A person commits the crime of resisting arrest if he intentionally prevents or attempts to prevent a peace officer from affecting a lawful arrest of himself or of another person.  (b) Resisting arrest is a Class B misdemeanor."  Ala. Code § 13A-10-41 (1975) (Replacement Vol. 2005).

13

guilty of both offenses.[64]  Plaintiff appealed his conviction to the Circuit Court for Madison County, Alabama, for trial *de novo*, but both offenses were ultimately dismissed.[65]

## IV.  DISCUSSION

### A.    Qualified Immunity

Plaintiff's claims against defendant in his individual capacity for illegal seizure and excessive force allegedly in violation of the Fourth and Fourteenth Amendments to the United States Constitution are asserted pursuant to 42 U.S.C. § 1983. Defendant has interposed the defense of qualified immunity.

The doctrine of qualified immunity protects governmental officials who are sued under 42 U.S.C. § 1983 for money damages in their personal, or individual, capacities, but only so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Courts generally apply a two-part test for evaluating whether a defendant is entitled to qualified immunity.  The "threshold question" for the district court to resolve is whether the facts, viewed "in the light most favorable to the party asserting the injury," show that "the officer's

---

[64] Doc. no. 30-7 (Deposition of Sonney Summers), at 114-15.
[65] *Id.*

14

conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[66] If the threshold question is answered in the affirmative, the court will proceed to analyze the second part of the inquiry: *i.e.*, "whether the right was clearly established." *Id*.[67]

In determining whether the unlawfulness of an official's actions was clearly established, "'the salient question is whether the state of the law [at the time of the unconstitutional act] gave respondents fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1270 (11th Cir. 2003) (alterations in original) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). The Supreme Court has rejected the requirement that the facts of previous cases must always be "materially similar" to those facing the plaintiff. *Hope*, 536 U.S. at 739. Instead:

---

[66] The defendant claiming immunity must also "prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). Here, it cannot reasonably be disputed that defendant was acting within the scope of his discretionary authority as a deputy sheriff during the events that serve as the basis of this suit. Hence, that undisputed fact does not merit textual discussion.

[67] The Supreme Court recently relieved lower courts from mandatory adherence to the order of the two-part analysis articulated in *Saucier*. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory."). It is now within the court's discretion to, in appropriate cases, assume that a constitutional violation occurred for the purpose of addressing, in the first instance, whether such a violation would be "clearly established." *Id*. That said, and under the circumstances of the present case, the tested sequence of analysis of *Saucier* will be followed.

> For a constitutional right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  *This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful*, see Mitchell [*v. Forsyth*, 472 U.S. 511,] 535, n.12, 105 S. Ct. 2806, 86 L. Ed. 2d 411; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."  *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987).

*Hope*, 536 U.S. at 739 (emphasis supplied, alteration in original).

As the Eleventh Circuit has observed, an officer can receive "fair notice" that his or her conduct in specific circumstances may be unlawful in various ways.

> First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances to overcome qualified immunity, even in the *total absence of case law*.  This kind of case is one kind of "obvious clarity" case.   For example, the words of a federal statute or federal constitutional provision may be so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.

> Second, if the conduct is not so egregious as to violate, for example, the Fourth Amendment on its face, we then *turn to case law*. When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts.  *See Marsh* [*v. Butler County, Alabama*], 268 F.3d [1014,] 1031-32 n.9 [11th Cir. 2001].  For example, if some authoritative judicial decision decides a case by determining that "X Conduct" is unconstitutional *without tying* that determination to a particularized set of facts, the decision on "X Conduct" can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding "X Conduct" are immaterial to the violation.  These judicial decisions can control "with

16

obvious clarity" a wide variety of later factual circumstances.  These precedents are hard to distinguish from later cases because so few facts are material to the broad legal principle established in these precedents; thus, this is why factual differences are often immaterial to the later decisions.  But for judge-made law, there is a presumption against wide principles of law.  And if a broad principle in case law is to establish clearly the law applicable to a specific set of facts facing a governmental official, it must do so "with obvious clarity" to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.

Third, if we have no case law with a broad holding of "X" that is not tied to particularized facts, we then look at precedent *that is tied to the facts*.  That is, we look for cases in which the Supreme Court or we, or the pertinent state supreme court has said that "Y Conduct" is unconstitutional in "Z Circumstances."  We believe that most judicial precedents are tied to particularized facts and fall into this category. . . . When fact-specific precedents are said to have established the law, a case that is fairly distinguishable from the circumstances facing a government official cannot clearly establish the law for the circumstances facing that government official; so, qualified immunity applies.  On the other hand, if the circumstances facing a government official are not fairly distinguishable, that is, are materially similar, the precedent can clearly establish the applicable law.

*Vinyard v. Wilson*, 311 F.3d 1340, 1350-52 (11th Cir. 2002) (emphasis in original, alterations supplied).  *See also Ashcroft v. al-Kidd*, – U.S. –, 131 S. Ct. 2074, 2083 (2011) ("We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.").

### 1.    Illegal seizure

Plaintiff claims that defendant illegally arrested ("seized") him in violation of

the Fourth Amendment because the arrest was "without probable cause or reasonable suspicion and without a warrant."[68]   To establish a violation of the Fourth Amendment when making an arrest, the plaintiff must show that the arrest was "unreasonable."   *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) ("Seizure alone is not enough for § 1983 liability; the seizure must be unreasonable.") (internal quotation marks and citation omitted).

An arrest is unreasonable when it is not supported by probable cause. *See, e.g., Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004).   "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id*. (citing *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)).   "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).   Therefore, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United*

_____

[68] *See* doc. no. 1 (Complaint) ¶ 14.

18

*States*, 517 U.S. 690, 696 (1996)) (alterations supplied).

Furthermore, *actual* probable cause is not required for purposes of claiming the benefits of the doctrine of qualified immunity. Instead, that doctrine applies "when there was *arguable* probable cause for an arrest even if *actual* probable cause did not exist." *See Crosby*, 394 F.3d at 1332 (emphasis supplied) (citing *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999)); *see also, e.g., Cottrell v. Caldwell*, 85 F.3d 1480, 1485 n.1 (11th Cir. 1996) ("[W]hen the claim is that a search and seizure or arrest violated the Fourth Amendment, qualified immunity depends upon whether *arguable* probable cause existed.") (alteration and emphasis supplied).

"*Arguable* probable cause exists if, under all of the facts and circumstances, an officer reasonably *could* — not necessarily *would* — have believed that probable cause was present." *Crosby*, 394 F.3d at 1332 (emphasis supplied). "Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001) (footnote omitted).[69] The pivotal

---

[69] The omitted footnote from *Scarbrough* reads as follows:

> Our inquiry in qualified-immunity analysis is whether the government actor's conduct violated clearly established law and not whether an arrestee's conduct is a crime or ultimately will result in conviction. Police officers are not expected to be lawyers or prosecutors. *See Lassiter* [*v. Alabama A&M University*], 28 F.3d [1146,]

point in determining whether arguable probable cause existed is the question of whether the information known by the officer at the time of the arrest was sufficient to warrant a reasonable person in forming the belief that the suspect had committed a crime. *Gernstein v. Pugh*, 420 U.S. 103, 111 (1975); *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998). Further, "[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest." *United States v. Saunders*, 476 F.2d 5, 7 (5th Cir. 1973)[70] (citing *United States v. Bowers*, 458 F.2d 1045 (5th Cir. 1972)) (alteration supplied); *see also United States v. Brookins*, 434 F.2d 41, 45 (5th Cir. 1972); *Klingler v. United States*, 409 F.2d 299, 304 (8th Cir. 1969).

Defendant argues that, at the time of the contested arrest, he had either actual or arguable probable cause to arrest plaintiff for disorderly conduct and resisting

---

1152 n.8 [(11th Cir. 1994)] (recognizing that it is "'unfair and impracticable' to hold public officials to the same level of knowledge as trained lawyers") (quoting *Davis v. Scherer*, 468 U.S. 183, 196 n.13, 104 S. Ct. 3012, 3020 n.13, 82 L. Ed. 2d 139 (1984)). The district judge focused on the arrestees instead of the arresting officer in his decision to deny Hall qualified immunity. The issue should have been whether Hall violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime.

*Scarbrough*, 245 F.3d at 1303 n.8 (alterations supplied).

[70] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

arrest.[71]  In the alternative, defendant contends that he had either actual or arguable

probable cause to arrest plaintiff for the additional, related offenses of obstruction of

governmental operations or violations of the Alabama Rules of the Road Act.[72]

"Whether a particular set of facts gives rise to probable cause or arguable probable

cause to justify an arrest depends . . . on the elements of the crime." *Crosby*, 394 F.3d

at 1333.   A brief analysis of the legal standards for each offense leads to the

conclusion that there are genuine issues of material fact precluding a conclusion that

defendant possessed either actual or arguable probable cause for arresting plaintiff.

### a.    Disorderly conduct

The offense of disorderly conduct is statutorily defined by the Code of

Alabama in the following manner:

> A person commits the crime of disorderly conduct if, with intent
> to cause public inconvenience, annoyance or alarm, or recklessly
> creating a risk thereof, he:
>
> > (1) Engages in fighting or in violent tumultuous or
> > threatening behavior; or
> >
> > (2) Makes unreasonable noise; or
> >
> > (3) *In a public place uses abusive or obscene
> > language or makes an obscene gesture*; or

---

[71] *See* doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at
14.

[72] *Id*. at 17-23.

> (4) Without lawful authority, disturbs any lawful assembly or meeting of persons; or

> (5) *Obstructs vehicular or pedestrian traffic, or a transportation facility*; or

> (6) Congregates with other person in a public place and refuses to comply with a lawful order of the police to disperse.

Ala. Code § 13A-11-7(a) (1975) (2005 Replacement Vol.) (emphasis supplied).  The words "abusive or obscene language" have been "interpreted narrowly to apply only to 'fighting words.'" *Robinson v. State*, 615 So. 2d 112, 113 (Ala. Crim. App. 1992) (quoting *Swann v. City of Huntsville*, 455 So. 2d 944, 950 (Ala. Crim. App. 1984))[73]; *see also L.M.A.W. v. State*, 611 So. 2d 497 (Ala. Crim. App. 1992); *Mosley v. City of Auburn*, 428 So. 2d 165, 166 (Ala. Crim. App. 1982), *superseded on other grounds by Mason v. City of Vestavia Hills*, 518 So. 2d 221 (Ala. Crim. App. 1987).

> "Fighting words" are "those words which have a likelihood of causing a violent response by the person to whom they are addressed.  They are words that by their very utterance provoke a swift physical retaliation and incite an immediate breach of the peace."  *Skelton v. City of*

---

[73] Each probable cause determination turns on an interpretation of Alabama state law.  Where the highest state court — here, the Alabama Supreme Court — has ruled on the issue, the federal court will follow its rule.  *See, e.g., Molinos Valle Del Cibao, C., por A. v. Lama*, 633 F.3d 1330, 1348 (11th Cir. 2011).  Where the highest state court has not yet ruled on a precise issue; however, a federal court must follow the decisions of state intermediate appellate courts, unless "persuasive evidence demonstrates that the highest court would conclude otherwise."  *Id.*; *accord Auto-Owners Insurance Co. v. E.N.D. Services, Inc.*, 506 F. App'x. 920, 924 n.4 (11th Cir. 2013); *Allstate Life Insurance Co. v. Miller*, 424 F.3d 1113, 1116 (11th Cir. 2005).  Thus, absent "persuasive evidence" to the contrary, where the Alabama Supreme Court has not spoken on an issue, this court must accept the decisions of the Court of Criminal Appeals of Alabama as definitive authority on the interpretation of Alabama criminal law.

> *Birmingham*, 342 So. 2d 933, 936-37 (Ala. Crim. App. [1976]),
> *remanded*, 342 So. 2d 937 (Ala. 1976). *See also Swann*[, 455 So. 2d at
> 950]. The words used by the alleged offender "'must be calculated to
> cause an immediate breach of the peace. *It is not enough . . . they
> merely arouse anger or resentment.*'" *Swann*, 455 So. 2d at 950 (quoting
> *Skelton*, 342 So. 2d at 937) (emphasis in original).

*Robinson*, 615 So. 2d at 113-14 (alterations supplied, emphasis in original). Further,

the mere fact that profanity is directed at a police officer does not transform it into

"fighting words." *Walker v. Briley*, 140 F. Supp. 2d 1249, 1258-59 (N.D. Ala. 2001).

This fact is even more true when the "exchange is not heard by other members of the

public." *Id.*; *see also R.I.T. v. State*, 675 So. 2d 97, 98-100 (Ala. Crim. App. 1992)

(statement of "fu** you" to police officer, spoken in front of only family members

and as juvenile was walking away from officer, did not constitute "fighting words").

It is undisputed that plaintiff told defendant to "go to hell."[74] Even so, such a

comment, standing alone, does not constitute the crime of disorderly conduct under

Alabama law.[75] Plaintiff's statement clearly was not calculated to cause an immediate

breach of the peace and, therefore, did not rise to the level of "fighting words" under

Alabama Code § 13A-11-7. Accordingly, defendant did not have either actual or

arguable probable cause to arrest plaintiff for that offense.

---

[74] Doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at 5; doc. no. 41 (Response to Defendant's Motion for Summary Judgment), at 3.

[75] *Accord* doc. no. 29 (Plaintiff's Motion for Partial Summary Judgment), at 6; doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at 16.

Even so, defendant alleges that the comment, when considered in conjunction with plaintiff's *actions* at the scene, does provide the requisite basis for actual or arguable probable cause under § 13A-11-7.[76]  As noted in Part III, *supra*, there are genuine issues of material fact concerning the manner in which plaintiff confronted defendant about his son's vehicle.  At this stage of the case, however, all facts must be viewed in the light most favorable to plaintiff.  Therefore, construing the facts in the light most favorable to plaintiff, this court concludes that exiting a vehicle, briefly standing in the roadway and inquiring about his son's vehicle, stating "go to hell," and walking back to his truck in compliance with defendant's order to return to the truck and depart the scene, does not provide the requisite basis for either actual or arguable probable cause to arrest plaintiff for the crime of disorderly conduct.  *See Crosby*, 394 F.3d at 1332 ("Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense.") (citing *Gerstein*, 420 U.S. at 111); *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990) ("[A]pplying the qualified immunity test in the context of [p]laintiff's alleged unlawful arrest, we must determine whether reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed

---

[76] Doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at 16.

to arrest [p]laintiff . . . .") (alterations supplied).

Even so, defendant also argues that, when plaintiff exited his vehicle and entered the roadway during an active traffic stop, he made it reasonable for defendant to conclude that plaintiff had "obstruct[ed] vehicular or pedestrian traffic" in violation of Alabama Code § 13A-11-7(a)(5). Viewing the facts in the light most favorable to plaintiff, it is clear that he stood briefly in the roadway; however, there is no indication that plaintiff actually obstructed traffic. Therefore, defendant did not have actual or arguable probable cause to arrest plaintiff under § 13A-11-7(a)(5).

### b.   Resisting Arrest

A person commits the crime of resisting a *lawful* arrest under Alabama law if "he intentionally prevents or attempts to prevent a peace officer from affecting [*sic*] a lawful arrest of himself or of another person." Ala. Code § 13A-10-41 (1975) (2005 Replacement Vol.).  An arrest without a warrant, as here, may legally occur "if a public offense has been committed or a breach of the peace threatened in the presence of the officer."[77]  Ala. Code § 15-10-3(1) (1975) (2011 Replacement Vol.).

Nevertheless, there is no Alabama law or practice that criminalizes resistance of an *unlawful* arrest.  *See Shinault v. City of Huntsville*, 579 So. 2d 696, 698 (Ala.

---

[77] Ala. Code § 15-10-3 contains seven additional scenarios in which an arrest without a warrant may be effected, including the commission or suspected commission of a felony, Ala. Code § 15-10-3(6), issuance of a protective order, § 15-10-3(7), and offenses involving domestic violence, § 15-10-3(8).  None of those scenarios are applicable to the case at issue.

Crim. App. 1991); *see also id.* at 699-700 (Bowen, J., concurring).  Indeed, Alabama

law has historically *permitted* the use of reasonable force to resist an *unlawful* arrest.

*See* Ala. Code § 13A-3-28 Commentary (1975) ("Alabama law . . . allows a person

to use reasonable force to resist an *unlawful* arrest.") (emphasis supplied) (citing

*Spooney v. State*, 217 Ala. 219, 225 (Ala. 1928); *Brown v. State*, 109 Ala. 70, 91 (Ala.

1895); *Tarwater v. State*, 75 So. 816, 817 (Ala. Crim. App. 1917)); *see also, e.g.,*

*Brown*, 109 Ala. at 91 ("It is not the duty of the citizen to submit to any other than a

*lawful* arrest.  It has been said the duty 'is found in the law side by side with the right

of resistance to an unlawful one . . . .'") (emphasis supplied) (quoting *Drennan v.*

*People*, 10 Mich. 169, 186 (Mich. 1862)).

Defendant has not met his burden of showing that his warrantless arrest of

plaintiff was "lawful."  *See, e.g., Celotex*, 477 U.S. at 323.  The lawfulness of that act

turns upon the predicate question of whether defendant had probable cause for

arresting plaintiff for disorderly conduct, or one of the related offenses alleged.

Accepting plaintiff's version of events, no reasonable person in defendant's position

could have believed the underlying arrest was lawful.  Because a lawful arrest is the

prerequisite for the crime of resisting arrest, no reasonable person in defendant's

position could have believed that probable cause to arrest existed for that offense.

*See* Ala. Code § 13A-10-41 (1975) (2005 Replacement Vol.).  Therefore, defendant

26

is not entitled to summary judgment on the issue of qualified immunity on this ground.

### c.   Related offenses

Defendant argues in the alternative that, even if actual or arguable probable cause did not exist to arrest plaintiff for either of the charged offenses of disorderly conduct and resisting arrest, arguable probable cause existed to arrest him for obstruction of governmental operations, and two violations of the Alabama Rules of the Road Act.[78]

Even though plaintiff was never charged with those offenses, if arguable probable cause existed for his arrest for any of those offenses, defendant would be entitled to claim the defense of qualified immunity. *See Duruthy v. Pastor*, 351 F.3d 1080, 1090 n.6 (11th Cir. 2003) (An officer "is shielded by qualified immunity so long as [he] had probable cause to arrest [the plaintiff] for *any offense*") (alterations and emphasis supplied); *Lee*, 284 F.3d at 1195-96 ("[T]he validity of an arrest does not turn on the offense announced by the officer at the time of the arrest[.]") (alterations supplied) (internal citations and quotations omitted); *Scarbrough*, 245 F.3d at 1302 ("[A]ll that is required for qualified immunity to be applicable to an arresting officer is 'arguable probable cause to believe that a person is committing a

---

[78] Doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at 19-21.

particular public offense.'") (quoting *Redd v. City of Enterprise*, 140 F.3d 1378, 1384 (11th Cir. 1998)) (alteration supplied).

Thus, if defendant had actual or arguable probable cause to arrest plaintiff for any offense, the arrest will be deemed valid.  Each offense raised by defendant as having either an actual or arguable probable cause basis under the facts alleged by plaintiff will be analyzed below.

Defendant first asserts that there was actual or arguable probable cause to arrest plaintiff for obstruction of governmental operations.  Alabama law defines that offense as follows:

> A person commits the crime of obstructing governmental operations if, by means of intimidation, physical force or interference or by any other independently unlawful act, he:
>
> > (1)  Intentionally obstructs, impairs or hinders the administration of law or other governmental function; or
> >
> > (2) Intentionally prevents a public servant from performing a governmental function.

Ala. Code § 13A-10-2 (1975) (2005 Replacement Vol.).  A "governmental function" is defined as "[a]ny activity which a public servant is legally authorized to undertake on behalf of a government or the fire control activities of a member of a volunteer fire department."  Ala. Code § 13A-10-1(3) (1975) (2005 Replacement Vol.) (alteration supplied).  A "public servant" is "[a]ny officer or employee of government, including

28

legislators and judges and any person or agency participating as an adviser, consultant, or otherwise in performing a governmental function." Ala. Code § 13A-10-1(7) (1975) (2005 Replacement Vol.) (alteration supplied).

Defendant asserts that he had at least arguable probable cause to believe that plaintiff obstructed governmental operations by interfering with his efforts to assist the other deputies at the scene of the traffic stop. Specifically, defendant contends that plaintiff diverted his (defendant's) attention from the traffic stop by exiting his vehicle, entering the roadway, and confronting him. The factual record, however, does not support defendant's argument. Plaintiff only drove to the scene of the traffic stop to pick up his son's vehicle. While defendant contends that plaintiff appeared agitated and shouted angrily at him, plaintiff denies those allegations and, at this stage of the litigation, this court must construe the facts in the light most favorable to plaintiff. Further, the confrontation with defendant on the roadway was brief, and there is no evidence indicating that plaintiff blocked the flow of traffic, or disrupted the apprehension of the subjects at the scene.[79] Even though plaintiff told defendant

---

[79] *See* doc. no. 41 (Response to Defendant's Motion for Summary Judgment), at 5 (citing doc. no. 42-1 (Deposition of Brian Chaffin), at 40-41 (noting that it is not illegal to stop and try to talk to a deputy sheriff about picking up a vehicle at the scene of a traffic stop); doc. no. 30-4 (Deposition of Jeremy Hughes), at 34, 68 (stating that plaintiff did not interfere with the other deputies' apprehension of the subjects at the scene); doc. no. 30-5 (Deposition of James Rives), at 70 (stating that there was no concern that plaintiff would interfere with the deputies' dealings with his son)).

29

to "go to hell," he then attempted to comply with defendant's repeated orders to leave by walking towards the passenger side door of his truck.

No reasonable officer could have believed those actions to be so intimidating, physically threatening, or interfering as to indicate that plaintiff was intentionally obstructing, impairing, or hindering defendant from performing the governmental function of investigating and assisting with the traffic stop. Thus, the record, construed in the light most favorable to plaintiff, supports a finding that defendant did not have actual or arguable probable cause to arrest plaintiff for obstruction of governmental operations.

Defendant also alleges that he had actual or arguable probable cause to arrest plaintiff for at least two violations of the Alabama Rules of the Road Act. *See* Ala. Code § 32-5A-1 *et seq*. (1975) (2010 Replacement Vol.). One section of that Act states that "[n]o person shall willfully fail or refuse to comply with any lawful order or direction of any police officer . . . invested by law with the authority to direct, control, or regulate traffic." Ala. Code § 32-5A-4 (1975) (2010 Replacement Vol.) (alteration supplied). A "police officer" is defined as "every officer authorized to direct or regulate traffic or to make arrests for violations of traffic regulations." Ala. Code § 32-1-1.1(45) (1975) (2010 Replacement Vol.). Further, the duties of a sheriff include those that are or may be imposed by law. *See* Ala. Code § 36-22-3 (1975)

30

(2001 Replacement Vol.).  Therefore, as a deputy sheriff, defendant clearly had the authority to "direct, control, or regulate traffic."  Ala. Code § 32-5A-4 (1975).

Defendant argues that, when plaintiff did not obey his order to "stop" and/or "come here," he had arguable probable cause to arrest plaintiff under § 32-5A-4.[80] Even so, there is a genuine issue of material fact as to whether that order was ever given.  For instance, plaintiff's wife, Christine Summers, stated in her deposition that "nobody said a word" after plaintiff told defendant to "go to hell" and before the physical altercation occurred.[81]  In addition, plaintiff testified in his deposition that "he never heard a word out of [defendant's mouth]" after he (plaintiff) told defendant to "go to hell."[82]  Therefore, construing the record in the light most favorable to plaintiff, this court finds that defendant did not have actual or arguable probable cause to arrest plaintiff for violating a traffic-related order pursuant to Alabama Code § 32-5A-4.

Defendant additionally alleges that there was probable cause to arrest plaintiff for violating Alabama Code § 32-5A-58, which states: "[t]he driver of any vehicle other than one on official business shall not follow any authorized emergency vehicle traveling in response to an emergency call closer than 500 feet or stop such vehicle

---

[80] *See* doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at 21-22.

[81] Doc. no. 30-6 (Deposition of Christine Summers), at 38.

[82] Doc. no. 30-7 (Deposition of Sonney Summers), at 91 (alteration supplied).

within 500 feet of any authorized emergency vehicle stopped in answer to an emergency call."[83] Ala. Code § 32-5A-58 (1975) (2010 Replacement Vol.) (alteration supplied).  In response, plaintiff contends that he was the passenger in, and not the driver of, the vehicle in which he was transported to the scene.  Thus, this court concludes that § 32-5A-58 does not apply, and that defendant lacked either actual or arguable probable cause to arrest plaintiff under that statute.

### d.   Reasonable suspicion or arguable reasonable suspicion to temporarily detain plaintiff

Despite all that has been said above, a law enforcement officer may, "consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (in turn citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123 (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); *see also Jackson*, 206 F.3d at 1165.  Therefore, "the officer must be able to articulate

---

[83] *See* doc. no. 32 (Defendant's Brief in Support of its Motion for Summary Judgment), at 22.

more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Wardlow*, 528 U.S. at 123-24 (internal quotations omitted) (citing *Terry*, 392 U.S. at 27).

Further, when an officer asserts the defense of qualified immunity in the context of an investigatory stop, "the issue is not whether reasonable suspicion existed in fact, but whether the officer has 'arguable' reasonable suspicion to support an investigatory stop." *Jackson*, 206 F.3d at 1165-66; *see also Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009); *Williamson v. Mills*, 65 F.3d 155, 157 (11th Cir. 1995); *Swint v. The City of Wadley, Alabama*, 51 F.3d 988, 996 (11th Cir. 1995); *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1558 (11th Cir. 1993). "In undertaking the arguable reasonable suspicion inquiry, this [c]ourt must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion." *Kobayashi*, 581 F.3d at 1309 (citing *Brent v. Ashley*, 247 F.3d 1294, 1303 (11th Cir. 2001)) (alteration supplied). A finding that the officer's suspicion was in fact mistaken is immaterial so long as the officer's suspicion was reasonable. *See id.*; *Brent*, 247 F.3d at 1303; *Jackson*, 206 F.3d at 1165.

Viewing the facts in the light most favorable to plaintiff, arguable reasonable suspicion for an investigatory stop did not exist. According to plaintiff's evidence,

33

he arrived at the scene of an active traffic stop, exited his vehicle, briefly stood in the roadway to inquire about his son's vehicle, was told to leave the scene, and then became upset and told defendant to "go to hell."  As this court explained in Part IV.A.1.a, *supra*, telling an officer to "go to hell" does not provide either probable cause or reasonable suspicion to stop that individual.  Plaintiff testified in his deposition that, as he was returning to his vehicle after defendant's repeated commands to leave the scene, he was then grabbed from behind by defendant and eventually detained.  There is a genuine issue of material fact as to whether defendant commanded plaintiff to "stop" and/or "come here"; however, at this stage, all facts must be viewed in the light most favorable to plaintiff.  Further, the Supreme Court has held that when, an officer approaches an individual without a reasonable suspicion of criminal activity, that person has the right to ignore the police and go about their own business, unmolested.  *Florida v. Royer*, 460 U.S. 491, 498 (1983); *see also Florida v. Bostick*, 501 U.S. 429, 437 (1991) (A "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure.").  Thus, viewing the facts in the light most favorable to plaintiff, a reasonable police officer would have known that he lacked arguable reasonable suspicion for stopping plaintiff, and that he was violating clearly established law in doing so.

**2.     Excessive force**

Plaintiff also claims that defendant violated his Fourth Amendment right to be free from the use of excessive force by assaulting and battering him.[84]  Specifically, plaintiff alleges that defendant grabbed him from behind, beat his head against his truck, slammed him to the ground, kneed him in the back, and then handcuffed him.[85] Plaintiff argues that, because there was no probable cause for an arrest, there was no basis for the use of *any* force.  In the alternative, plaintiff contends that, even if there was an arguable basis for detaining him, the force used by defendant remains excessive.

The court will first address plaintiff's allegation that no force was lawful because there was no probable cause for an arrest.  "The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest."  *Lee*, 284 F.3d at 1197 (citing *Graham v. Connor*, 490 U.S. 386, 394-95 (1989)).  The reasonableness inquiry is an objective one:  "the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."  *Graham*, 490 U.S. at 397 (citations omitted)

---

[84] *See* doc. no. 1 (Complaint) ¶ 12.
[85] Doc. no. 41 (Response to Defendant's Motion for Summary Judgment), at 6.

35

(alterations supplied).

Under the law of the Eleventh Circuit, however, a "claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim." *Lee*, 284 F.3d at 1193 (quoting *Jackson*, 206 F.3d at 1171 (in turn citing *Williamson v. Mills*, 65 F.3d 155, 158-59 (11th Cir. 1995))). The logic of the rule is clear: if an arrest was illegal, *i.e.*, lacking in probable cause, then *any force* used in effecting the arrest is excessive. *See Jackson*, 206 F.3d at 1171; *see also Nolin v. Isbell*, 207 F.3d 1253, 1258 (11th Cir. 2000) (reaffirming that any force used while effectuating an arrest lacking probable cause is excessive); *Sheth v. Webster*, 145 F.3d 1231, 1238 (11th Cir. 1998); *Thornton v. City of Macon*, 132 F.3d 1395, 1398 (11th Cir. 1998). Further, any potential damages recoverable from the excessive force claim would be recovered in a successful suit for a false arrest. *See Williamson*, 65 F.3d at 159 ("[D]amages recoverable on [plaintiff's] false arrest claim include damages suffered because of the use of force in effecting the arrest.") (alterations supplied). Thus, plaintiff's claim for excessive force on the basis that the arrest was unlawful is subsumed under plaintiff's illegal seizure or arrest claims. *See Jackson*, 206 F.3d at 1171 ("The correct analysis is that the excessive force claim is subsumed in the illegal stop or arrest claim, as recognized in *Williamson*, where a plaintiff contends the force was excessive because there was

36

no basis for *any* force.") (emphasis in original).

Because a claim for excessive force during a lawful arrest is an independent claim, the court now turns to plaintiff's claim that, even if there was an arguable basis for detaining him, the force used was excessive.  The court may consider a number of factors when determining whether the force applied was "reasonable" under the circumstances, including:  (1) the "severity, or lack of severity, of the alleged crime in issue," *Graham*, 490 U.S. at 396; (2) "whether the person against whom the force was used posed an immediate threat to the safety of the police or others," *id.*; (3) "the need for the application of force," *Jackson*, 206 F.3d at 1170 n.18; (4) "the relationship between the need and the amount of force used," *id.*; (5) "the extent of the injury inflicted," *id.*; (6) "whether the force was applied in good faith or maliciously and sadistically," *id.*; (7) "the possibility that the persons subject to the police action are themselves violent or dangerous," *id.*; (8) "the possibility that the suspect may be armed," *id.*; (9) "the number of persons with whom the police officers must contend at one time," *id.*; and (10) "whether the suspect was resisting or fleeing." *Id.*

The reasonableness of the force applied also is measured as of the precise moment it is administered.  Events that occurred prior to that moment, though perhaps giving factual context to the use of force, are not probative of the reasonableness of

37

the decision to use force.  *See Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991).

Additionally, "[u]se of force must be judged on a case-by-case basis 'from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight.'"  *Post*, 7 F.3d at 1559 (quoting *Graham*, 490 U.S. at 396) (alteration

supplied).  "The calculus of reasonableness must embody allowance for the fact that

police officers are often forced to make split-second judgments — in circumstances

that are tense, uncertain, and rapidly evolving — about the amount of force that is

necessary in a particular situation."  *Graham*, 490 U.S. at 396-97.

Looking at the facts known to defendant at the moment when he used force on

plaintiff, but accepting plaintiff's version of the facts as true for purposes of summary

judgment, defendant grabbed a man from behind, slammed his head against the truck

frame, threw him to the ground, and kneed him in the back, all because that individual

had arrived at the scene of a traffic stop, confronted defendant about picking up his

son's vehicle, told him to "go to hell" after being twice ordered to leave the scene,

and walked back to his vehicle.  Plaintiff was handcuffed shortly after being knocked

to the ground.

Although the level of force defendant used was not particularly high, and did

not cause plaintiff any lasting physical injuries (plaintiff's pain ceased after one

week), the majority of the remaining factors weigh in plaintiff's favor.  The alleged

crimes at issue — disorderly conduct, obstructing governmental operations, and violations of the Alabama Rules of the Road Act — were not severe.  Under plaintiff's version of events, no reasonable officer could have concluded that grabbing plaintiff from behind, slamming his head against a truck, throwing him to the ground, and kneeing him in the back were necessary for the protection of the deputy sheriffs at the scene or to prevent plaintiff from fleeing.  In fact, plaintiff had been twice ordered to leave.  Plaintiff's only resistance was in telling defendant to "go to hell" after numerous attempts to explain why he  was at the scene, and allegedly attempting to pull his arm away after being grabbed from behind.  Even if throwing plaintiff to the ground and kneeing him in the back were necessary to subdue plaintiff, given his alleged attempt to pull his arm away, slamming his head against the frame of the vehicle multiple times was certainly not.  Further, there were three deputies at the scene, and defendant was *not* one of the deputies questioning and apprehending the actual subjects of the traffic stop.

Upon the arrival of a pair of unknown individuals at the scene of an active traffic stop, a reasonable officer would have asked the reason for their presence, and then given them the opportunity to explain before immediately ordering them to leave the scene.  A reasonable officer *might* fear that a person who had just told an officer to "go to hell" was returning to his vehicle to obtain a weapon, but he *would have*

39

asked that person to step away from the vehicle and to show his hands, to demonstrate the absence of a weapon, before grabbing him from behind, slamming his head against the vehicle, and throwing him to the ground.  Further, no reasonable officer would have concluded that such actions were an appropriate response to that person telling him to "go to hell."  Simply put, considering the facts in the light most favorable to plaintiff, there was no reason for defendant to believe that plaintiff posed a threat, was armed, or was resisting the order to leave the scene.  Thus, plaintiff has presented sufficient facts to support his claim for excessive force.

Moreover, the court concludes that defendant is not entitled to qualified immunity on plaintiff's excessive force claim.  "A law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive." *Brown v. City of Huntsville, Alabama*, 608 F.3d 724, 738 (11th Cir. 2010) (citations omitted).  It is true that plaintiff has not identified a case with identical facts.  Even so, no reasonable officer in defendant's position would have believed that defendant's use of force was not excessive.  The Eleventh Circuit has long held "that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008); *see also Lee*, 284 F.3d at 1198 (holding that slamming an individual's head onto the hood of her car

40

when she was handcuffed, not posing a threat to the officer, and not posing a flight risk constituted excessive force). Under plaintiff's verison of the facts, no reasonable officer could have concluded that plaintiff posed a threat to their safety. Even if a reasonable officer *might* have worried that plaintiff was walking back to his vehicle to retrieve a weapon, he *would* have asked plaintiff to step away from the vehicle and raise his hands into the air before grabbing plaintiff from behind, slamming his head against a vehicle, and throwing him to the ground. Even if a reasonable officer *might* have concluded that plaintiff resisted arrest by attempting to pull his arm away, he certainly *would not* have slammed plaintiff's head against the frame of his vehicle multiple times. Under the circumstances presented here, defendant's use of force must be characterized as wantonly "gratuitous," and, thus, he is not entitled to qualified immunity on plaintiff's excessive force claim.

## B.    Plaintiff's Motion for Summary Judgment

Plaintiff seeks summary judgment as to his false arrest claim, but not as to his excessive force claim.[86] Plaintiff alleges that defendant lacked either actual or arguable probable cause to arrest him and, as such, he is entitled to summary judgment on that claim.[87] As discussed in Part IV.A.1.a, *supra*, the court agrees with

---

[86] *See* doc. no. 29 (Plaintiff's Motion for Partial Summary Judgment).
[87] *See id.* at 4.

the parties that merely telling a police officer to "go to hell," standing alone, does not constitute actual or arguable probable cause for an arrest for disorderly conduct. Even so, this court found that genuine issues of material fact exist concerning plaintiff's alleged "unusual comments and unusual demeanor" upon arriving at the scene of the traffic stop and in confronting defendant. Thus, when viewing the facts in the light most favorable to defendant, the nonmoving party, plaintiff is not entitled to summary judgment as to his false arrest claim.

## V.  CONCLUSION

In accordance with the foregoing, the plaintiff's motion to strike is DENIED; plaintiff's motion for summary judgment is DENIED; and defendant's motion for summary judgment is DENIED. The case will be set for pretrial conference and trial by separate order.

**DONE** and **ORDERED** this 11th day of December, 2013.

_____
United States District Judge

42